RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 10a0394p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

UNITED STATES OF AMERICA,
                            *Plaintiff-Appellee,*

   *v.*                                                         No. 09-3398

JOSHUA TROY MCCARTY,
                            *Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Ohio at Toledo.
No. 08-00409-001—David A. Katz, District Judge.

Argued:  December 2, 2010

Decided and Filed:  December 28, 2010

Before:  KENNEDY, COLE, and ROGERS, Circuit Judges.

_____

## COUNSEL

**ARGUED:**  Elizabeth N. Gaba, Columbus, Ohio, for Appellant.  Thomas O. Secor,
ASSISTANT UNITED STATES ATTORNEY, Toledo, Ohio, for Appellee.
**ON BRIEF:**  Elizabeth N. Gaba, Columbus, Ohio, for Appellant.  Thomas O. Secor,
ASSISTANT UNITED STATES ATTORNEY, Toledo, Ohio, for Appellee.

_____

## OPINION

_____

COLE, Circuit Judge.  Defendant-Appellant Joshua T. McCarty appeals his
conviction and within-Guidelines sentence of forty-six months' imprisonment for
knowingly stealing two cultural heritage objects, in violation of 18 U.S.C. § 668(b).
Specifically, McCarty alleges six general errors: (1) the district court improperly
calculated the value of the stolen cultural heritage objects under U.S. Sentencing
Guidelines Manual ("U.S.S.G." or "Guidelines") § 2B1.1(b)(1) (2008); (2) the district

1

court improperly found that he stole the objects "for pecuniary gain" under U.S.S.G. § 2B1.5(b)(4) (2008); (3) the district court improperly determined that he "engaged in a pattern of misconduct involving cultural heritage resources" under U.S.S.G. § 2B1.5(b)(5) (2008); (4) the district court violated his constitutional rights by considering his uncharged and unconvicted conduct in determining his sentence; (5) the district court did not adequately consider his mental health issues; and (6) he received ineffective assistance of counsel before the district court.

For the reasons below, we **AFFIRM** McCarty's sentence.

**I.**

McCarty is a thirty-four-year-old man who has a history of mental illness, including hallucinations, paranoia, schizoaffective disorder (bipolar type), obsessive compulsive disorder, post-traumatic stress disorder and borderline personality disorder. McCarty was hospitalized in 2000 for psychiatric issues. He suffers also from ongoing depression and drug abuse problems. McCarty has received intermittent treatment and medication for these mental health issues, but stopped in approximately 2006.

McCarty has several prior state-court convictions, including for unauthorized use of property, falsification, theft and various vehicular offenses. Additionally, McCarty was convicted of theft of lost or mislaid property in 2007 for selling a historical map—an 1865 "Map of Oil Territory near Tidioute, Warren County"—that had been stolen along with fifty to sixty other such maps (valued, in total, at approximately $20,000) from a bookstore in Harrisburg, Pennsylvania. McCarty sold the stolen map to a bookstore in Evanston, Illinois.

Also, McCarty was under investigation for a burglary at a bookstore in Chicago, Illinois, from which a number of books were stolen. McCarty had lived in Chicago, admitted to being in the Chicago area at the time, and knew the name of the robbed bookstore without its prior disclosure to the public. About two weeks after the burglary, McCarty's girlfriend, Angela Bays, attempted to sell several books matching those taken from the Chicago bookstore at a bookstore in Columbus, Ohio. McCarty resided in

Columbus until his current arrest and prosecution.  Police eventually recovered from McCarty's apartment several books matching the description of the books stolen in Chicago.

McCarty was also suspected of stealing books from a bookstore burglarized in Columbus, Ohio when police discovered a list of books in his apartment with cities, prices and some dates, and the bookstore owner indicated that four of the twelve books on McCarty's list corresponded to books stolen from the owner's Columbus shop, including a "Dictionary of the English Language, Volumes I and II," which sold for $6,000 and was published in 1773.

On June 27, 2008, while Bays was with him, and while on probation for Ohio and Illinois convictions, McCarty stole from the Rutherford B. Hayes Presidential Center ("Hayes Center"), a museum in Fremont, Ohio, a book titled "Laws of the Territory of the United States North West of the River Ohio," also known as the "Freeman Code," and published in 1798.  On August 25, 2008, McCarty and another individual stole from the Hayes Center a book titled "Laws of the Territory of the United States North West of the Ohio," also known as the "Maxwell Code," and published in 1796.  McCarty ultimately sold the Freeman Code for $35,000, and gave the Maxwell Code to the mother of one of his children to keep for him.  McCarty regularly buys and sells books, particularly antique books, and at some point prior to his theft of the Maxwell Code, McCarty discussed his purported ownership of the Maxwell Code and the possibility of selling the Freeman Code with various historical book collectors and dealers.

McCarty was subsequently arrested and then indicted in the U.S. District Court for the Northern District of Ohio for two counts—one for each of the Freeman and Maxwell Codes (collectively, "Codes")—of knowingly stealing cultural heritage objects, in violation of 18 U.S.C. § 668(b).  McCarty eventually pled guilty, after a change-of-plea hearing during which the court found him competent to plead.  In response to the Presentence Investigation Report ("PSR"), McCarty filed objections, but the government did not.  Throughout this period, Federal Bureau of Investigation Special Agent Charles Holloway was investigating McCarty; the government disclosed—through Special Agent

Holloway's testimony—the results of this investigation at McCarty's sentencing. In particular, Special Agent Holloway testified, among other things, to McCarty's prior uncharged behavior related to cultural heritage objects, McCarty's actions surrounding the instant charged offenses, and the value of the Codes. Having found that McCarty's criminal background merited a criminal history category III classification, the district court determined his offense level to be 21, after a three-level reduction for acceptance of responsibility and application of the enhancements in U.S.S.G. §§ 2B1.1(b)(1)(F) (2008) (adding ten levels), 2B1.5(b)(4) (2008) (adding two levels), and 2B1.5(b)(5) (2008) (adding two levels). The district court then calculated McCarty's Guidelines range to be between forty-six and fifty-seven months, and sentenced him to forty-six months' imprisonment. McCarty timely appealed.

## II.

We review the factual findings undergirding the district court's application of the Guidelines for clear error, but we apply the Guidelines to those facts de novo. *United States v. Gregory*, 315 F.3d 637, 642 (6th Cir. 2003). "A [district court's] finding is clearly erroneous where, although there is evidence to support it, the reviewing court . . . is left with the definite and firm conviction that a mistake has been committed." *United States v. Webb*, 616 F.3d 605, 609 (6th Cir. 2010) (internal quotation marks and citation omitted).

A defendant's sentence must be both substantively and procedurally reasonable. *Gall v. United States*, 552 U.S. 38, 46 (2007); *see also United States v. Barahona-Montenegro*, 565 F.3d 980, 983 (6th Cir. 2009). "A sentence may be considered substantively unreasonable when the district court selects a sentence arbitrarily, bases the sentence on impermissible factors, fails to consider relevant sentencing factors, or gives an unreasonable amount of weight to any pertinent factor." *United States v. Conatser*, 514 F.3d 508, 520 (6th Cir. 2008) (citation omitted). In assessing the procedural reasonableness of a defendant's sentence, we "ensure that the district court committed no significant procedural error, such as failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to

consider the [18 U.S.C.] § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence." *United States v. Martinez*, 588 F.3d 301, 324 (6th Cir. 2009) (internal quotation marks and citation omitted).  At oral argument, the government abandoned seeking plain error review, so we examine the reasonableness of McCarty's sentence for abuse of discretion.  *See Conatser*, 514 F.3d at 520.

## III.

### A. Type and Nature of Evidence Considered at Sentencing

As an initial matter, McCarty objects to the district court's consideration of hearsay evidence and uncharged and unconvicted conduct in crafting his sentence, specifically that adduced through the testimony of Special Agent Holloway.  However, the Guidelines explicitly contemplate such consideration.  *See, e.g.*, U.S.S.G. §§ 1B1.1 cmt. n.1(H) (2008), 2B1.5 cmt. n.6(A) (2008).  Also, we have held that the rules of evidence—including the general prohibition on hearsay—do not apply at sentencing, and that a district court may properly consider a defendant's uncharged and unconvicted conduct in determining his or her sentence; due process requires simply that "*some* evidentiary basis beyond mere allegation in an indictment be presented to support consideration of such conduct as relevant to sentencing." *United States v. Silverman*, 976 F.2d 1502, 1512 (6th Cir. 1992) (en banc) (quoting *United States v. Herrera*, 928 F.2d 769, 773 (6th Cir. 1991)); *see also United States v. Al-Cholan*, 610 F.3d 945, 955 (6th Cir. 2010).

Here, Special Agent Holloway's testimony contained an "evidentiary basis beyond mere allegation in a complaint": He provided a detailed explanation for the foundation of his opinions and the findings of his extensive investigation, and the district court determined that his testimony merited credence.  We thus reject McCarty's argument that the district court improperly considered hearsay evidence or his uncharged and unconvicted acts.

**B. The Codes' Value**

In determining McCarty's Guidelines range, the district court applied a ten-level offense enhancement, U.S.S.G. § 2B1.1(b)(1)(F) (2008), which applies when the stolen property's value exceeds $120,000 but is equal to or less than $200,000.  McCarty argues that the district court never determined that the Codes' combined value *exceeded* $120,000, and that, even if it did, the district court erred in doing so.  Therefore, only an eight-level enhancement would be proper.  *See* U.S.S.G. § 2B1.1(b)(1)(E) (2008).  The government responds that the district court's language, read in context, demonstrates that the district court intended to apply U.S.S.G. § 2B1.1(b)(1)(F) (2008) and thus found the Codes' combined value to exceed $120,000; the government also notes that the record independently supports application of the ten-level enhancement.  The focus of the parties' dispute is therefore whether the Codes' value merited an eight-level or ten-level offense enhancement.

We have stated that "the district court is to determine the amount of loss [under U.S.S.G. § 2B1.1(b)(1)] by a preponderance of the evidence, and the district court's findings are not to be overturned unless they are clearly erroneous."  *United States v. Triana*, 468 F.3d 308, 321 (6th Cir. 2006) (citation omitted).  However, we review the district court's "methodology for calculating loss"—to wit, "whether those facts as determined by the district court warrant the application of a particular" offense-level increase—de novo.  *Id.* (internal quotation marks and citations omitted).  In calculating the amount of loss, "[t]he [district] court need only make a reasonable estimate of the loss.  The sentencing judge is in a unique position to assess the evidence and estimate the loss based upon that evidence.  For this reason, the [district] court's loss determination is entitled to appropriate deference."  U.S.S.G. § 2B1.1 cmt. n.3(C) (2008).  Specifically regarding valuation of "cultural heritage resource[s]" such as the Codes, the commentary states: "In a case involving a cultural heritage resource, loss attributable to that cultural heritage resource shall be determined [under] . . . Application Note 2 of the Commentary to §2B1.5."  U.S.S.G. § 2B1.1 cmt. n.3(F)(vii) (2008).  That provision, meanwhile, merely restates the idea that the district court "need only make

a reasonable estimate of the value of the cultural heritage resource based on available information." U.S.S.G. § 2B1.5 cmt. n.2(B) (2008). Moreover, the section states that the object's value is, in relevant part, the "commercial value" of the item, U.S.S.G. § 2B1.5 cmt. n.2(A)(ii) (2008), which it defines as "the fair market value of the cultural heritage resource at the time of the offense," U.S.S.G. § 2B1.5 cmt. n.2(C)(ii) (2008).

Here, the district court received numerous estimates from various sources on the value of the Codes: Expert estimates of the market value of the Maxwell Code ranged from $40,000 to "as much or more than" $112,500, with most at or above $100,000, while expert estimates of the market value of the Freeman Code ranged from $30,000 to $45,000. Ultimately, the district court determined that the value of the Codes was "at a minimum of 120,000," but that there was "some significant evidence of value in excess of 135,000, which is but frosting on the cake because it does not approach the top limit . . . [of] 200,000." (Sentencing Hr'g Tr., Dist. Ct. Docket No. 47, at 42.) Moreover, later in its explicit findings of fact, the district court reiterated: "I find that the combined value of the Maxwell Code and Freeman Code is *at least* $120,000, but not more than $200,000, so that ten additional levels are added pursuant to Guideline Section 2B1.1B1F." (*Id.* at 45 (emphasis added).)

The district court's precise language does not definitively establish that it found the Codes to be worth *greater than* $120,000. However, reading the district court's finding in light of its observation regarding "some significant evidence of value in excess of 135,000" and its belief that U.S.S.G. § 2B1.1(b)(1)(F) (2008) applied, suggests that the district court intended to find the Codes worth greater than $120,000. The evidence adduced regarding the Codes' value further supports this conclusion: The district court's determination indicates that it decided to credit the PSR's analysis—based on victim impact testimony from the Hayes Center's director—as well as Special Agent Holloway's testimony regarding his conversations with various experts, not the statements from McCarty's expert—a Dayton, Ohio book dealer—that would have placed the combined value at or below $120,000.

We thus conclude that the district court properly applied the ten-level enhancement of U.S.S.G. § 2B1.1(b)(1)(F) (2008).

**C. "For Pecuniary Gain"**

McCarty argues that the district court improperly applied U.S.S.G. § 2B1.5(b)(4) (2008), which increased his offense by two levels. McCarty claimed below, and continues to claim here: "I had never heard of this book before and in the heat of the moment, I had a lapse of judgment and put the book in my shirt. A moment later, I left the library and drove home." (PSR ¶ 29.) The government responds that the district court properly applied the enhancement given the evidence in the record.

Section 2B1.5(b)(4) (2008) of the Guidelines increases a defendant's offense level by two points if "the offense was committed for pecuniary gain or otherwise involved a commercial purpose." The commentary defines "for pecuniary gain" as "for receipt of, or in anticipation of receipt of, anything of value, whether monetary or in goods or services." U.S.S.G. § 2B1.5 cmt. n.5(A) (2008).

Only one federal court has discussed this provision: *United States v. Amlee*, 308 F. App'x 862 (5th Cir. 2009). In *Amlee*, the Fifth Circuit found the enhancement applicable because there was evidence that the defendant's intention in stealing various antique items was possibly to sell them at some point in the future. *Id.* at 864. The Fifth Circuit thus focused on the defendant's intent during commission of the crime. *Id.* We agree with the Fifth Circuit, and the plain text of the provision, that the enhancement's language appears to focus on the defendant's intention at the time of the theft.

Here, the district court concluded that U.S.S.G. § 2B1.5(b)(4) (2008) applied "since Mr. McCarty sold the Freeman Code for 35,000." (Sentencing Hr'g Tr., Dist. Ct. Docket No. 47, at 45-46.) Additionally, the district court stated that, though it was unsure of whether McCarty's "disorders have an impact upon his ability to recognize the seriousness of what he was about to do before he did it, . . . [s]uffice it to say that . . . he had the prerequisite intent to do the act of theft and subsequent act of sale of rare books." (*Id.* at 54.) While the ultimate sale *may* itself speak to McCarty's intention at the time

of the theft, it does not inherently do so and arguably does not by itself constitute evidence adequate to justify application of U.S.S.G. § 2B1.5(b)(4) (2008).  In this case, however, the district court also received evidence from Special Agent Holloway that McCarty regularly bought and sold books, including antique books, and that McCarty had discussed his purported ownership of the Maxwell Code and the possible sale of the Freeman Code even before stealing at least the Maxwell Code.  These two facts, coupled with the ultimate sale, supported the district court's conclusion that "pecuniary gain" motivated McCarty's thefts, so the district court thus properly applied this enhancement.

### D. "A Pattern of Misconduct Involving Cultural Heritage Resources"

McCarty further argues that the district court improperly found that he "engaged in a pattern of misconduct involving cultural heritage resources" and consequently wrongly increased his offense by two levels.  *See* U.S.S.G. § 2B1.5(b)(5) (2008).

### 1. Timing

As a preliminary matter, McCarty objects to the government's failure to object to the PSR, which did not discuss this enhancement, and the fact that the government first revealed that it was seeking application of this enhancement at sentencing.

In the similar circumstances of *United States v. Smith*, we addressed a situation in which the defendant alleged prejudice from the government's failure to argue for application of a particular PSR provision (or object to the PSR) prior to sentencing. 429 F.3d 620, 629-30 (6th Cir. 2005).  We held that, notwithstanding any error regarding advance notice prior to the sentencing, the "Defendant received the appropriate remedy for any shortcoming on the part of the Government here: The sentencing was continued and the Defendant had extra time to prepare for the hearing."  *Id.*

Defense counsel here initially objected to the government's presentation of previously undisclosed evidence at sentencing: "I would raise an objection about that because we are -- today's the date of sentencing.  I have not received any documentation or anything with a valuation written out such as ours was, and I did disclose this to the prosecution."  (Sentencing Hr'g Tr., Dist. Ct. Docket No. 47, at 6-7.)  The district court,

however, replied: "I will let the government present its evidence.  You will have an opportunity for cross examination, and if you believe that it is important for you to have additional time, we'll discuss it." (*Id.* at 7.)  The district court thus effectively offered defense counsel the "appropriate remedy" that we discussed in *Smith*: more time to prepare adequately for sentencing after hearing the government's new arguments. Nonetheless, defense counsel proceeded with the sentencing and never again raised the issue of her preparedness or requested more time.  McCarty's objection to the timing of the government's argument is thus not well taken.

### 2. Merits

The "pattern of misconduct" enhancement requires the government to show "two or more separate instances of offense conduct involving a cultural heritage resource that did not occur during the course of the offense."  U.S.S.G. § 2B1.5 cmt. n.6(A) (2008). In relevant part, the government must therefore present, and the district court must credit, evidence detailing (1) two or more (2) instances of offense conduct (3) involving a cultural heritage resource.  *Id.*

In this case, the district court received evidence regarding three possible instances of "offense conduct" unrelated to the instant charges: (1) a theft of fifty to sixty "historical" maps from a bookstore in Harrisburg, Pennsylvania ("Harrisburg theft"); (2) a theft of various books from a bookstore in Columbus, Ohio ("Columbus theft"); and (3) a theft of various books from a bookstore in Chicago, Illinois ("Chicago theft"). Discussing the applicability of this enhancement, the district court stated: "I must admit that at least two of the three [instances], and it takes two, are very convincing.  The same young woman who was with him in Fremont at the Hayes Center ends up selling materials stolen in Chicago within two weeks.  That's more than coincidental." (Sentencing Hr'g Tr., Dist. Ct. Docket No. 47, at 47.)  The district court then concluded that the enhancement applied.

Examination of the evidence demonstrates that the district court had no factual basis for applying the enhancement, specifically because there is no evidence in the record establishing that two of the three "instances of offense conduct"—including the

one explicitly referenced by the district court—actually involved "cultural heritage resource[s]." The commentary defines "cultural heritage resource" as, in relevant part, "[a]n object of cultural heritage, as defined in 18 U.S.C. § 668(a)(2)." U.S.S.G. § 2B1.5 cmt. n.1(F) (2008). That statutory section, meanwhile, defines an "object of cultural heritage" as, in relevant part, "an object that is . . . [(1)] over 100 years old and [(2)] worth in excess of $5,000." 18 U.S.C. § 668(a)(2)(A). This definition stands in contrast to the short-hand used by the government and district court in finding this enhancement applied—namely, "ancient books." (Sentencing Hr'g Tr., Dist. Ct. Docket No. 47, at 47.)

Here, the Chicago theft is the one on which the district court focused—the district court did not specify which of the other two thefts it found credible—in applying the U.S.S.G. § 2B1.5(b)(5) (2008) enhancement. Special Agent Holloway provided the only evidence regarding that theft, but noticeably absent from his description of the theft is an identification of the age of the books taken or the value thereof—and the district court did not make any findings regarding either element before applying the enhancement. The Chicago theft thus could not constitute one of the two required acts of misconduct for an enhancement under U.S.S.G. § 2B1.5(b)(5) (2008).

Similarly, the Harrisburg theft does not constitute an "instance of offense conduct" that involves a "cultural heritage resource." While the PSR indicated that the fifty or sixty maps were worth $20,000 in total, only the age of a single map—the 1865 "Map of Oil Territory near Tidioute, Warren County"—existed in the record. The record thus contains no single object satisfying the two requirements of an "object of cultural heritage": The 1865 map is old enough, but its isolated value is unknown; meanwhile, the group of maps—if they may even be considered a single "object" for purposes of the statute—satisfy the value requirement, but there is no indication of their age (besides that of the lone 1865 map). *See* 18 U.S.C. § 668(a)(2)(A).

Therefore, notwithstanding the fact that the Columbus theft *would* be adequate to constitute a prior instance of offense conduct involving "an object of cultural heritage"—because a list obtained from McCarty's apartment included a book from 1773

purportedly stolen from the Columbus bookstore and worth $6,000—the record contains no other "instance[] of offense conduct" adequate to ground a finding that McCarty "engaged in a pattern of misconduct involving cultural heritage resources." *See* U.S.S.G. § 2B1.5(b)(5) (2008).   The district court thus erroneously applied the "pattern of misconduct" enhancement and therefore improperly calculated McCarty's Guidelines range.

Consequently, "'we are required to remand for resentencing unless we are certain that any such error was harmless.'" *United States v. Jeross*, 521 F.3d 562, 569 (6th Cir. 2008) (quoting *United States v. Vicol*, 514 F.3d 559, 561 (6th Cir. 2008)).  "A sentencing error is harmless if we are certain that the error did not affect the district court's selection of the sentence imposed."  *Id.* (internal quotation marks and citation omitted).

Here, immediately prior to pronouncing McCarty's forty-six month sentence, the district court explained:

> I must say that while I believe that the two level enhancement that I have included [under § 2B1.5(b)(5)] was appropriate, I have also concluded that the number of months, whether it's a 19 level or 21 level [offense], that I intended to sentence this man at would remain constant, and you will hear that now.

(Sentencing Hr'g Tr., Dist. Ct. Docket No. 47, at 54-55.)  Through this statement, the district court indicated that its sentence would have been the same irrespective of the improper application of U.S.S.G. § 2B1.5(b)(5) (2008), and its error was thus harmless. *See Jeross*, 521 F.3d at 569.  This is especially so because McCarty's forty-six month sentence fell within the Guidelines range regardless of whether the district court sentenced McCarty at an offense level of nineteen or twenty-one. *See* U.S.S.G. ch. 5, pt. A (2008) (showing a range of 37-46 months for criminal history category III, offense level 19, and a range of 46-57 months for criminal history category III, offense level 21).

We thus conclude that though the district court's application of U.S.S.G. § 2B1.5(b)(5) (2008) was erroneous, it constituted harmless error and resentencing is unnecessary.

### E. McCarty's Mental Health

McCarty next argues that the district court did not give adequate weight to his mental health problems in imposing a forty-six month sentence, and contends that his mental issues merited a lesser sentence.[1] The government responds that the district court understood its discretion to vary or depart downwards, and adequately addressed McCarty's mental health issues.

"The district court's decision to deny a Guideline-based departure . . . is not reviewable by this Court so long as the district court was aware of and understood its discretion to make such a Guideline-based departure," *United States v. McBride*, 434 F.3d 470, 476 (6th Cir. 2006) (citation omitted), and nothing in the record suggests that the district court did not understand its ability to vary or depart downwards based on McCarty's mental health. However, we still review the reasonableness of a sentencing determination based on "the [18 U.S.C.] section 3553(a) factors in their totality." *Id.* at 476-77.

The district court's discussion demonstrates that it adequately considered and weighed McCarty's mental health in crafting his sentence. Specifically, the district court acknowledged that it "need[ed] to be sensitive to the significant and detailed mental history of this defendant as outlined in the [PSR] and [defense counsel]'s memorandum." (Sentencing Hr'g Tr., Dist. Ct. Docket No. 47, at 53-54.) The district court then detailed McCarty's mental health issues, and concluded that "[a]ll of these things militate in favor of two things, and two things only in my mind": (1) "that I request the Bureau of Prisons to take account of these issues and institutionalize him where he can get help in dealing with th[ese] disorders"; and (2) that, while the district court was uncertain regarding whether "th[ese] disorders ha[d] an impact upon his ability to recognize the

---

[1] Additionally, McCarty implies that the district court should not have accepted his guilty plea due to questions about his mental health, but the district court adequately assuaged its concerns about McCarty's competence to plead by discussing the issue with McCarty and defense counsel, the latter of whom explicitly stated that "he and I have talked pretty extensively," and "I don't think there's a competency issue." (Plea Hr'g Tr., Dist. Ct. Docket No. 44, at 6-7). We review competency determinations for clear error, *Harries v. Bell*, 417 F.3d 631, 635 (6th Cir. 2005), and McCarty has not shown, nor does the record independently reveal, that the district court committed clear error in determining that McCarty was competent to plead guilty.

seriousness of what he was about to do before he did it, . . . [McCarty] had the prerequisite intent to do the act of theft and subsequent act of sale of rare books." (*Id.* at 54.) We require no more than such consideration to establish the reasonableness of a defendant's sentence. *See, e.g.*, *United States v. Moon*, 513 F.3d 527, 539 (6th Cir. 2008) ("While the district court need not engage in a ritualistic incantation of the [18 U.S.C.] § 3553(a) factors, its opinion should be sufficiently detailed to reflect the considerations listed in § 3553(a) and to allow for meaningful appellate review." (internal quotation marks and citations omitted)); *see also United States v. Kirchhof*, 505 F.3d 409, 416-17 (6th Cir. 2007) (affirming a district court's decision to decline to vary or depart downwards based on a defendant's psychological issues given adequate consideration and reasoning).

### F. Ineffective Assistance of Counsel

Lastly, McCarty claims his trial counsel was ineffective for failing to: (1) request a continuance to be able to address the pattern-of-conduct enhancement that the government sought for the first time at the sentencing hearing; (2) instruct McCarty to obtain a plea deal in exchange for his cooperation with the government in his prosecution; and (3) investigate possible defenses or alternatives given McCarty's mental health history before instructing McCarty to plead guilty.

We have noted that "[a] guilty plea can be involuntary as a result of the ineffective assistance of counsel." *United States v. Gardner*, 417 F.3d 541, 545 (6th Cir. 2005) (citing *Hill v. Lockhart*, 474 U.S. 52, 59 (1985)). However, "ordinarily we will not review a claim of ineffective assistance of counsel on direct appeal because the record is usually insufficient to permit adequate review of such a claim. These claims are [thus] more properly raised in a postconviction proceeding brought pursuant to 28 U.S.C. § 2255." *Id.* (internal citations omitted); *see also United States v. Long*, 190 F.3d 471, 478 (6th Cir. 1999) ("We generally will not review an ineffective assistance of counsel claim on direct appeal, as such claims are more appropriately raised in a post-conviction motion under 42 U.S.C. § 2255 when an adequate record may be developed on the issue."). In *Gardner*, therefore, we found the defendant's claim

unripe on direct review because "the alleged ineffectiveness of [the defendant]'s counsel [was] not apparent. The record contain[ed] no evidence regarding what advice, if any, his counsel provided with regard to the potential drug-quantity enhancement." 417 F.3d at 545. We reasoned that it would be better to allow a district court first to develop the evidentiary record on § 2255 review before examining the merits of the defendant's ineffective assistance claims. *Id.*; *see also United States v. Lopez-Medina*, 461 F.3d 724, 737 (6th Cir. 2006) (finding an ineffective assistance of counsel claim unripe on direct review because "the alleged ineffectiveness of [the defendant]'s trial counsel [was] not apparent from the record," such as "why, for example, defense counsel chose not to file any additional motions beyond his initial motion," so we could not "determine whether his actions reflected a reasoned trial strategy").

Likewise, here the record does not explain why defense counsel did not ask for a continuance or what her strategy entailed regarding McCarty's mental history or guilty plea. The record on these claims is underdeveloped, and McCarty's appellate brief consists largely of unsubstantiated allegations without affidavits from defense counsel or himself to buttress his arguments. Such circumstances present precisely the type of situation discussed in *Gardner* and *Lopez-Medina*, and we therefore find McCarty's ineffective assistance claims unripe.

**IV.**

For the reasons explained above, we **AFFIRM** McCarty's sentence.